IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA HUNT, etc.,          )
                              )
            Plaintiff,        )
                              )
    v.                        )    No. 05 C 6927
                              )
JO ANNE B. BARNHART, Commissioner )
of Social Security,           )
                              )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

Patricia Hunt ("Patricia") seeks judicial review of the

final decision of Commissioner of Social Security Jo Anne

Barnhart ("Commissioner") denying the claim of the late James

Hunt ("Hunt") for disability insurance benefits.[1] Each side has

moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and

Hunt has alternatively moved to remand for further proceedings.

For the reasons stated in this memorandum opinion and order, both

Rule 56 motions are denied, but Hunt's alternative motion is

granted.[2]

## Procedural Background

On May 4, 2001 Hunt filed an application for disability

insurance benefits, alleging an onset date of July 1, 2000 (R.

---

[1]  Because Hunt died after filing his claim, this action is
being brought--as the case caption reflects--by his ex-wife
Patricia on behalf of his son Jason (R. 58-65, 85). In the
interest of simplicity, this memorandum opinion and order will
proceed as if Hunt himself is seeking review.

[2]  What follows is drawn from the administrative record
(cited "R.--").

93-95). His claim was denied both initially and upon reconsideration (R. 69-71, 73-76), and in early 2002 he filed a request for a hearing before an administrative law judge ("ALJ") (R. 68).[3] In response to that request an administrative hearing ("Hearing") was held on August 6, 2004 before ALJ Richard C. VerWiebe. Patricia and Hunt's close friend James Krizmis ("Krizmis") testified (R. 15, 80).[4]

On February 24, 2004 the ALJ issued an "unfavorable" decision (R. 12), finding that Hunt was capable of performing past relevant work and therefore "was not under a 'disability' as defined in the Social Security Act" (R. 19-20). Hunt's request for review was denied by the Appeals Council on October 12, 2005, making the ALJ's decision the final determination by Commissioner (R. 4). Hunt then filed this timely action for judicial review pursuant to 42 U.S.C. §405(g).[5]

## General Background

Hunt was born on October 15, 1950 (making him 49 years old

---

[3] Hunt died on December 9, 2002, while that request was pending (R. 85).

[4] Although Hunt's lawyer inexplicably spells Krizmis' name with an "a" ("Krizmas"), this opinion uses the "Krizmis" spelling employed in Hunt's handwritten application (R. 96).

[5] Further references to Title 42 will take the form "Section --," omitting the prefatory "42 U.S.C.," while all 20 C.F.R. provisions will be cited "Reg. §--" and all Social Security rulings will be cited "SSR --." Finally, Hunt's and Commissioner's legal memoranda will be cited "H. Mem.--" and "C. Mem.--," respectively.

2

on his alleged date of onset) and, as of his filing date, weighed 160 pounds and stood 5 feet 9 inches tall (R. 93, 96). After completing 11 years of education, he worked as an engine tester, as a service manager for a car dealership and, finally, as manager and part owner of a bar (R. 98, 103).

Hunt asserted that by July 2000 he was unable to keep working at the bar because of complications from his diabetes and a stroke[6] he had suffered the month before (R. 97-102). In particular, Hunt complained of difficulty in walking, numbness on his left side (including his face, arm and leg), an inability to stand for long periods, impaired mobility and difficulty in seeing to the point that he was unable to read (R. 97). Hunt similarly reported in his "daily activities" questionnaire that due to his "lack of vision and having a stroke" he was unable to do any household chores, hobbies, repairs or even to read, he needed help with "everything" and he left his home less than once a week (R. 119-20).

## Medical Evidence

In support of his claim, Hunt submitted a number of records reflecting medical care he received between 1999 and his death in December 2002. Given the importance of those records to the

---

[6] Although the medical records generally speak of Hunt as having suffered a "cerebrovascular accident," this opinion will use the more accurate term "stroke" (Stedman's Medical Dictionary ["Stedman's"] 9 (27th ed. 2000)).

3

ALJ's findings, a detailed review is in order.

First, after his stroke in June 2000 Hunt was seen regularly by a small circle of doctors--primarily Drs. R. Ivanova and Nihad Muhrez--at the Portage Health Center (R. 189-207, 231-44). In the course of those visits his examining physicians assessed him as suffering from, among other things, retinopathy,[7] neuropathy,[8] vertigo and dizziness, left side numbness, muscle weakness and fatigue (id.).

Those assessments also indicated, however, that at least at times Hunt was "not compliant," had trouble controlling his diet, did not take his medications and did not properly monitor his blood sugar (see, e.g., R. 194, 198-99, 238). One report (the only one authored by Dr. I. Kapoor) suggested that Hunt suffered from "alcohol abuse" (R. 192). Some reports also state that at times Hunt's blood sugar was "fairly stable," that he had refused further testing and that he missed a recommended appointment with a neurologist (R. 194, 238-39, 41). On the other hand, there are

---

[7] Retinopathy is a "[n]oninflammatory degenerative disease of the retina" (Stedman's at 1560).

[8] Neuropathy is "a disease involving the cranial nerves or the peripheral or autonomic nervous system" (Stedman's at 1211). When neuropathy stems from diabetes, Stedman's at 1212 states that it can involve, among other things, hypesthesia ("[d]iminished sensitivity to stimulation" (id. at 857)), hyperesthesia ("[a]bnormal acuteness of sensitivity to touch, pain, or other sensory stimuli" (id. at 849)) and paresthesia ("[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling" (id. at 1316)).

4

reports saying that at other times Hunt's blood sugar was not stable and that the reason for Hunt's refusal to get further testing done was a lack of insurance (R. 194, 196, 204).

Hunt also received regular treatment for his vision problems, again from a number of physicians. Dr. Richard Lipman diagnosed Hunt with diabetic retinopathy, and under his care Hunt underwent no fewer than seven laser surgeries (six to his left eye and one to his right) between March 24, 1999 and January 31, 2000 (R. 140-41). According to the disability questionnaire Dr. Lipman filled out at the state's request, Hunt's visual acuity after all but the last of those surgeries was 20/40 in his right eye and 20/80 in his left (R. 141). Dr. Douglas Zale saw Hunt over a much shorter time period (February 23 to March 2, 2001), and--again in response to a state disability questionnaire--he agreed with Dr. Lipman's diabetic retinopathy diagnosis and found Hunt's visual acuity to be 20/50 in his right eye and 20/100 in his left (R. 183). Finally, the results of Dr. Susan Taub's single August 20, 2002 examination, while not perhaps fully decipherable to the layperson, strongly suggest that Hunt's visual acuity had deteriorated markedly to as low as 20/400 in one eye (R. 246).

In addition to those scheduled examinations, Hunt also was seen in an emergency context on two occasions. First, in April 2000 paramedics called to Hunt's home found him to be suffering

5

from "diabetic symptoms" such as a "disoriented level of consciousness" (R. 136-37). Then on June 5, 2001 Hunt was involved in a "minor" single-car accident (R. 161, 165). He was diagnosed with hypoglycemia[9] and a "soft tissue injury" and released (R. 161). Hunt admitted to having had two or three alcoholic drinks earlier that day (R. 163-65).

Finally, the record contains a number of state-ordered medical examinations and evaluations. In addition to asking treating Drs. Lipman and Zale to fill out disability questionnaires, the state also arranged for two non-treating physicians to examine Hunt and for a non-examining doctor to provide a "Physical Residual Functional Capacity Assessment." Those examinations are described in ensuing paragraphs.

First, on August 7, 2001 Dr. A. Khan performed a general exam, finding that Hunt suffered from diabetes, high blood pressure and "Status Post [Stroke] With Sensory Deficit On The Left" (R. 210). Dr. Khan observed that Hunt had "normal gait" and "full range of motion in all joints," was "[a]ble to stoop or squat" and was "[a]ble to get on and off examination table without assistance" (R. 209). Dr. Khan also found Hunt to have "decreased feeling of sensory sensation on the whole left side"

---

[9] Hypoglycemia involves "[s]ymptoms resulting from low blood [sugar]," such as sweating, trembling, nausea, dizziness, confusion, tiredness, difficulty speaking, headache and inability to concentrate (Stedman's at 861).

6

and a visual acuity, without glasses, of 20/70 in his right eye
and 20/100 in his left (R. 209-10).

On September 24, 2001 Dr. Eric Friedman performed an
opthamological exam, in which he too found Hunt to be suffering
from diabetic retinopathy (R. 214-15). Dr. Friedman found Hunt's
"best corrected visual acuity" to be 20/40 in his right eye and
20/200 in his left (R. 215). He also commented that Hunt's right
eye was "still doing fairly well" and that Hunt was "able to
carry out work and leisure related activities at this time," but
he noted that "diabetes tends to be progressive" (R. 216).

Finally, on October 9, 2001 state agency physician Dr. L.
Bastnagel reviewed the record evidence and completed a "Physical
Residual Functional Capacity Assessment" of Hunt (R. 221-228).
Exertionally, Dr. Bastnagel--after recounting Hunt's history of
stroke, his left side numbness and his vision difficulties--found
Hunt able (1) to lift and/or carry 50 pounds occasionally and 25
pounds frequently and (2) both to "stand and/or walk" and to sit
for six hours in an eight-hour workday, and he also found no
limits to Hunt's ability to push or pull ("other than as shown
for lift[ing] and/or carry[ing]") (R. 222).[10] Dr. Bastnagel also
found that Hunt could climb, balance, stoop, kneel, crouch and

---

[10] As discussed later, nothing in the earlier medical
history provided any basis for Dr. Bastnagel's specific findings,
and he himself gave no indication as to where he derived any of
the numbers he somehow came up with.

7

crawl only "occasionally" but that he had no manipulative,
communicative or environmental limitations (R.223-25). Oddly,
although he observed that Hunt had 20/70 vision in his right eye
and 20/100 vision in his left (without glasses), Dr. Bastnagel
did not say whether or not he felt that such diminished acuity
created actual visual limitations for Hunt (R. 224). Lastly, Dr.
Bastnagel's overall assessment was affirmed in a one-sentence
statement by another state agency physician, Dr. A. Lopez, on
December 31, 2001 (R. 228).

## Lay Evidence

ALJ VerWiebe also discussed the testimony of Patricia and
Krizmis, although he made no reference to an affidavit submitted
by John T. Toma ("Toma"), Hunt's business partner and co-owner of
the bar (R. 55-56). Again a detailed account of that evidence--
this time the nonmedical evidence--is needed to round out the
record.

Patricia testified that Hunt first learned of his diabetes
when he was 29 and that he had trouble controlling it (R.27-29).
After she and Hunt divorced in 1992 their son Jason lived with
Hunt, and she would visit "at least once a month" both to see her
son and to go out to dinner with Hunt (R. 28). She reported that
at times, both before and after the divorce, Hunt's neuropathy
was so acute that he could not sleep in his bed because the touch
of sheets was too painful (R. 29). She also recounted that

8

Hunt's diabetes eventually interfered with his ability to work as a car dealership's service manager (R. 29-30). In particular Hunt could no longer stand as much as the job required, and he had trouble communicating with customers because "he would lose words" and became "forgetful" (R. 32). Patricia reported that after Hunt had left that job to become part owner in a bar and work there (R. 32), by the year 2000 Hunt "was in such bad shape he couldn't see," such that he "shouldn't have been driving," and he "couldn't keep food down" (R. 33). Eventually Hunt's partners "bought him out" of his bar ownership (R. 33). After he was bought out, Hunt "became very reclusive" and Patricia's interaction with him diminished (R. 35, 43-44).

Krizmis testified that he first got to know Hunt well after running into him at Hunt's bar sometime in 1998 (R. 35-37). Krizmis--who commonly saw diabetics in his work as a nurse for the Indiana Department of Corrections--stated that Hunt suffered from "everything a diabetic suffers from, and worse," including "mobility problems, sight problems, nutritional problems [and] communication problems" (R. 37). Hunt would become disoriented to the extent that Krizmis would "minimize him getting behind the wheel," and his vision deteriorated to the point where he was unable even to fill out paperwork (R. 40). Krizmis also said that Hunt complained of stroke symptoms such as numbness in the side of his face (R. 39-40). Although Hunt moved in with Krizmis

on a "full-time basis" in May 2000, he moved back out to "the block behind" Krizmis in May 2001 (R. 41). While Hunt lived on his own at that point, Krizmis at least spoke with him on a weekly basis "to see if he needed anything" and visited him every other weekend (R. 42). Krizmis would help him with paperwork, take him to doctor's appointments and go to the store for him (R. 42). Krizmis testified that Hunt's condition did not improve over that time, stating that he either cooked microwave food or got take-out for his meals, that he was not able to do laundry ("maybe once a month he washed his underwear"), that he was "very depressed, very malnourished" and that Hunt "slept in his clothes, because he was too weak, too tired to get completely undressed. He couldn't lace his shoes" (R. 43-44).

Finally, Toma's affidavit stated that Hunt was not able to stand to operate the cash register at the bar, that he "could not talk with patrons on an equal basis, because he would forget words, sentences and peoples names," that "[his] hands and feet would swell and become discolored," that he was often in pain and "not comfortable sitting in a chair for any length of time" and that Hunt could often not get himself to doctor's appointments or even to his home on his own (R. 55-56). In sum, according to Toma, Hunt "was not able to fulfill his duties at the restaurant" (R. 55).

10

## ALJ VerWiebe's Decision

Having reviewed "all of the evidence of record," the ALJ found that while Hunt did have diabetes and had suffered a stroke (R. 16), he was not entitled to disability benefits, as his limitations were not sufficient to prevent him from performing his past relevant work as a bar manager (R. 15, 19-20). In justifying that conclusion the ALJ first discussed Patricia's and Krizmis' hearing testimony (R. 17). While on both their versions Hunt's functional capabilities were significantly impaired, the ALJ found their testimony was "directly contradict[ed]" by the medical evidence on record, particularly citing Dr. Khan's consultative exam, Dr. Friedman's finding that Hunt "was able to perform his daily activities" and reports that "[Hunt's] blood sugar level stabilized August 2001" (R. 18). ALJ VerWiebe also pointed to Hunt's "recurrent...non-compliance," "the fact [Hunt's car] accident was alcohol related" and the fact that Hunt was able to "maintain[ ] his residence for some period of time" as factors undermining the general credibility of Hunt's allegations (R. 18). But disturbingly, Toma's affidavit was neither discussed nor even mentioned by the ALJ.

Next the ALJ stated that he "must also consider any medical opinions" in determining Hunt's functional capabilities (R. 18). Having summarized much of the medical evidence earlier in his report, the ALJ pointed specifically to Dr. Bastnagel's

11

assessment, which the ALJ read to have found that Hunt was "capable of medium work activity [and] performing postural activities only on...occasion" (R. 18). Stating that medical consultants' reports are generally "entitled to great weight," the ALJ then concluded--obviously adopting at least part of Dr. Bastnagel's findings--that until his death Hunt could "lift 50 pounds occasionally and 25 pounds frequently" (R. 18, with emphasis added).

That said, the ALJ then found that Hunt's "former job as a bar manager, as he generally performed it...did not require the performance of work activities precluded by [those] impairments" (R. 19). As he was therefore able to perform "past relevant work," Hunt "was not entitled to receive Disability Insurance Benefits" (R. 19).

## Standard of Review and Applicable Law

Judicial review of Commissioner decisions, as authorized by Section 405(g), is limited to determining (1) whether those decisions apply the correct legal standards and (2) whether there is substantial evidence in the record to support the findings (Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Substantial evidence means "no more than such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting--as always in these cases--Richardson v. Perales,

12

402 U.S. 389, 401 (1971)). In that respect this Court must "review the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner" (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)). That does not call, however, for an uncritical rubber-stamping of Commissioner's decision (id.).

To be eligible for benefits, Hunt must have demonstrated that he suffered from a "disability," defined this way in pertinent part by Section 423(d)(1)(A):

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

For that purpose Reg. §404.1520(a)(4) prescribes a sequential five-step test that asks (Briscoe ex rel Taylor v. Barnhart, 425 F.3d 345, 351-52 (7th Cir. 2005)):

> whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

For all but the fifth step of that test the claimant bears the burden of proof, and an affirmative answer at either step 3 or step 5 results in a finding of disability (id. at 352).

13

Of particular relevance in this case, before proceeding from step 3 to step 4 an ALJ must determine the claimant's "residual functional capacity" ("RFC") (Reg. §404.1520(a)(4)), defined as "the most [the claimant] can still do despite [his] limitations," expressed in terms of the claimant's "ability to meet the physical, mental, sensory and other requirements of work" (Reg. §404.1545(a)(1) and (a)(4)). Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001) teaches that "[i]n assessing the claimant's RFC, an ALJ must consider both the medical and nonmedical evidence in the record," including among other things the claimant's medical history, reports of his daily activities, his work evaluations and the effects of his symptoms (SSR 96-8p, 1996 WL 374184, at *5). Once the claimant's RFC is thus determined, the ALJ may then go on to step 4 and assess whether that RFC would allow the claimant to meet the requirements of his past relevant work.[11]

---

[11] Because Commissioner will be revisiting that issue upon remand, it must be stressed that the step 4 assessment cannot properly rely on broad categorical assessments of the past occupation's requirements. On the contrary, an adjudicator "must list the specific physical requirements of the previous job and assess, in light of available evidence, the claimant's ability to perform these tasks" (Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991)). For example, the ALJ's single conclusory sentence here, stating that "[i]n his former job as bar manager...the claimant's past work did not require the performance of work activities precluded by [his] medically determinable impairments" (R. 19), does not cut it.

14

## Evaluation of the ALJ's Decision

Hunt raises three separate challenges to the denial of his claim. First, he argues that the ALJ erred in failing to discuss or even acknowledge Toma's affidavit as to Hunt's total inability to perform his duties as bar manager. Second, Hunt contends that the ALJ's findings as to Hunt's limitations were "against the manifest weight of the evidence" (H. Mem. 6), taking issue in particular (1) with the ALJ's assessment of the other lay testimony, (2) with his assessment of the medical evidence concerning Hunt's vision problems and (3) with his grounds for discrediting Hunt's limitation claims. Finally, Hunt argues that "new and extremely relevant evidence" (H. Mem.2)--an autopsy and a coroner's report--warrants a remand under sentence six of Section 405(g). As the ensuing discussion reflects, Hunt has the better of most, but not all, of those arguments.

### Toma Affidavit

As to ALJ VerWiebe's total failure even to mention Toma's affidavit, Commissioner points out that an ALJ "need not discuss every piece of evidence in the record" (Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004)). That however does not excuse the ALJ's silence in this instance, for he still "must articulate at some minimal level his analysis of the evidence" so as to allow for "meaningful [judicial] review" (Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (quotations omitted))--and most

15

particularly he "must confront the evidence that does not support his conclusion and explain why it was rejected" (Indoranto, 374 F.3d at 474; see also Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003)), rather than "select[ing] and discuss[ing] only that evidence that favors his ultimate conclusion" (Herron, 19 F.3d at 333).

Toma's affidavit speaks precisely, and in some detail, to the ultimate question upon which the ALJ passed judgment: whether Hunt was able to perform his past work as bar manager.[12] In doing so, moreover, it directly contradicts the ALJ's conclusion on that issue. Toma swears that Hunt could not in fact fulfill has bar managing duties, supporting that conclusion by such specifics as that Hunt (1) was unable to stand to operate the cash register, (2) "could not talk with patrons on an equal basis as he would forget words, sentences and peoples names" and (3) "was often in pain and...not comfortable sitting in a chair for any length of time" (R. 55-56)).

If Toma's affidavit is accurate, the ALJ's finding is surely not. By not having addressed Toma's version at all, the ALJ clearly failed to "confront" contrary evidence "and explain why

---

[12] Indeed, as Hunt points out, the ALJ himself commented on multiple occasions during the hearing that such evidence would be important to his decision (R. 34, 45). Nor is the Toma affidavit "merely duplicative" of Krizmis' and Patricia's testimony, as Commissioner would have it. As co-owner of the bar at which his partner Hunt worked, Toma had a unique vantage point from which to observe Hunt's ability to perform his duties as bar manager.

16

it was rejected" (Indoranto, 374 F.3d at 474), thus disabling
this Court from tracing the path of his reasoning and from thus
engaging in meaningful review (see Zurawski v. Halter, 245 F.3d
881, 888-89 (7th Cir. 2001)).

## ALJ's Evidentiary Assessments

Hunt also takes issue with the ALJ's treatment of some of
the evidence he did address--his evaluations of (1) Patricia's
and Krizmis' testimony, (2) Hunt's vision problems and (3) Hunt's
claims as to the extent of his limitations. Upon analysis those
objections meet with mixed results.

As to the first of those matters, there is little to commend
Hunt's claim that "[i]n addition to the affidavit of John Toma,
the testimony of the two witnesses, Patricia Hunt and James
Krizm[i]s, precludes a denial at step 4 and warrants a reversal"
(H. Mem. 6). What Hunt offers as support for that argument is
the ALJ's comment at the hearing that "Mr. Krizmis is a wonderful
witness, and very honest, and I believe him" (R. 48). There is
of course an obvious tension between that statement of belief and
the ALJ's acceptance of medical evidence that the ALJ accurately
characterized as contradicting Krizmis' and Patricia's testimony.
If that medical evidence justified the ALJ's reliance (a subject
discussed hereafter), the ultimate weighing of such conflicting
evidence would certainly be for the ALJ to conduct. But as will
be seen, the circumstances here call for a fresh look at that

17

aspect of the case. In any event, Hunt is wrong in seeking a reversal (rather than a remand) at this stage.

Next, as to the ALJ's treatment of Hunt's vision problems, he not only acknowledged Hunt's "history of laser examinations and decreased visual acuity," but he also made a point of noting the results of some of Hunt's numerous eye exams, including one that found his visual acuity (even when corrected) to be as bad as 20/50 in his right eye and 20/200 in his left. Although in the end the ALJ found that Hunt could nevertheless perform his past work, the ALJ's ruling offered an explanation for doing so, observing that Hunt had told Dr. Friedman that he was "able to perform daily living activities"--a self-assessment that Dr. Friedman agreed with and extended to a finding that Hunt was "able to carry out work and leisure related activities" at that time (R. 214, 216).[13]

As problematic as such reliance on Dr. Friedman's last-quoted statement thus appears to be, the ALJ's explanation is further cast into doubt by his failure to discuss or even mention the later eye exam administered by Dr. Taub. No less than lay

___

[13] Just how that extension can be justified is a mystery. What Hunt spoke of to Dr. Friedman was an ability "to accomplish daily living activities," not work. It is uncontroverted that Hunt's partners had bought him out of the bar business in 2000 because he couldn't do the work. Yet an ophthalmologist who examined only Hunt's eyes about a year later (in September 2001), when he was no longer working, somehow found it possible to opine that he "is able to carry out work"!

18

evidence, an ALJ may not simply ignore medical evidence at odds with his ruling. On the contrary, "all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ" (Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984)).

As reported by Dr. Taub, Hunt's vision was far worse--as low as 20/400 in one eye--than his earlier tests reflected (R. 246). Because the ALJ clearly regarded such evidence as relevant to the assessment of Hunt's ability to do his past work (there is no indication that Dr. Taub's report was not credible or unsupported by clinical findings), the ALJ erred in failing to discuss Dr. Taub's findings as well in his report.[14]

Finally, Hunt also challenges the ALJ's reasons for discrediting his claims of limitation. In particular, he takes issue with the ALJ's reliance on Hunt's "non-compliance" and with his reliance on the fact that alcohol was involved in Hunt's car accident.

In that respect, an ALJ may consider the extent to which a claimant has followed a recommended course of treatment in

---

[14] Neither party has spoken to the time factor involved. As stated at the outset, Hunt's original filing claimed a disability onset date of July 1, 2000, but the various medical examinations extended through 2001--or in Dr. Taub's case, August 2002. That however does not justify the ALJ's ignoring of that last examination--after all, his finding as to Hunt's RFC was a totally unsupported determination that "until his death, the claimant retained the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently."

19

assessing the credibility of his or her claim (SSR 96-7p, 1996 WL 374186, at *7; see, e.g., Dixon, 270 F.3d at 1179). But an ALJ may not draw any inferences about a claimant's credibility from his or her failure to seek or follow treatment "without first considering any explanations that the individual may provide, or other information in the case record" that might explain that failure (SSR 96-7p, 1996 WL 374186, at *7).

Here the ALJ appears not to have adhered to that directive before relying on Hunt's being "non-compliant in March and July 2001" (R.18). In particular, although several of Hunt's medical reports (from the same general set of records upon which the ALJ appears to have relied in finding Hunt non-compliant) note that he did not have health insurance (see, e.g., R. 192, 194, 204), the ALJ made no inquiry into that (or any other) possible justification for Hunt's "non-compliance." It was therefore improper for the ALJ to have relied on such a basis for discrediting Hunt's testimony.[15]

---

[15] Of course some varieties of non-compliance, such as failing to follow a proper diet, would presumably be unaffected by a lack of insurance coverage, while other forms, such as the failure to take prescribed medications, might well be. Regrettably the ALJ has not made clear which form of non-compliance he had in mind, again leaving this Court unable to conduct a meaningful review. Indeed, even the set of medical records to which the ALJ cites is unclear as to what Hunt's physicians meant by referring to Hunt as "non-compliant." Some records note that Hunt ate "candy a lot and ice cream" and that Hunt "[did] not take BS levels [at] home" (R. 190). Others, however, include observations that in addition to his dietary issues Hunt was "not compliant with meds" (R. 198) and indicate--

20

Similarly, the ALJ's statement that "the fact the claimant's [car] accident was alcohol related further discredits his allegation of disability" is also problematic (R. 18). Pursuant to SSR 96-7p, 1996 WL 374186, at *4, an ALJ's articulation of the bases for his credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight" (see also Steele v. Barnhart, 290 F.3d 936, 941-42 (7th Cir. 2002)).

Here the ALJ's quoted statement hardly explains how the involvement of alcohol in that accident (an accident whose relevance to Hunt's claims is peripheral at best) would undermine Hunt's credibility. While Commissioner attempts to flesh out the ALJ's argument on his behalf--suggesting that the ALJ was actually making a broader argument about Hunt's use of alcohol in general (C. Mem. 6)--that effort must be rejected. As Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003)(per curiam) teaches, "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."

---

under the heading "patient education"--that not only had Hunt's "Diet/Exercise" been "advised" but also that his medications had been "reviewed" and "refilled" (R. 193-96). Given that absence of clarity, this Court is unable to conclude that Hunt's lack of health insurance was necessarily irrelevant to his non-compliance.

With all of that said, what appears to be an even more
fundamental flaw infects the ALJ's decisional process. In all
candor, for such purposes the Bastnagle and Lopez opinions as to
Hunt's physical capabilities are not worth the paper (printed
forms with spaces for checkmarks) that they are written on.
Neither doctor examined Hunt physically--both relied instead on
other doctors' reports. And those other reports can be searched
in vain for any predicate for findings as to how much Hunt could
lift or carry, and they assuredly contained no evidence that he
could sit for six hours in an eight-hour day (indeed, that is
flatly rejected by Toma's affidavit, which is based directly on
his continuous first-hand personal dealings with Hunt). What
state agency physician Bastnagle plainly appears to have done is
to make wholly arbitrary choices as to which boxes to check on
the printed form, while Lopez simply signed onto those choices
without explanation--if such opinions were to be scrutinized
under a Daubert-Kumho lens, they would simply fail the test of
evidentiary admissibility.

What then can be said of the ALJ's rejection of the
eyewitness accounts as to stroke victim Hunt's impairments, and
as to their effect on his real-world functioning, on the basis
that those accounts were "directly contradict[ed]" by the medical
evidence? In the computer world the familiar acronym is "GIGO":

Garbage In, Garbage Out."[16]  Findings that are thus predicated on

flawed opinion evidence can be no better than those underlying

opinions themselves.

## Sentence Six Remand

Section 405(g) provides for only two categories of remand,

one pursuant to its sentence four and the other pursuant to its

sentence six (Melkonyan v. Sullivan, 501 U.S. 89, 97-100 (1991)).

Any sentence four remand is a substantive ruling "modifying, or

reversing the decision of the [Commissioner]" (and is presumably

the kind of remand that Hunt seeks as to his first two

challenges).  Sentence six calls for "an entirely different kind

of remand" (Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990)),

which carries with it no ruling "as to the correctness of the

administrative determination" (Melkonyan, 501 U.S. at 98), but

rather allows Commissioner--although only under certain

circumstances next discussed--to reconsider her decision in the

light of certain new evidence (id.).

Section 405(g) prescribes a sentence six remand only when

the proffered evidence is both "new" and "material" and "there is

good cause for the failure to incorporate such evidence into the

---

[16]  Although the ALJ referred to the nonexamining doctors'
opinions as "expert medical opinion" (R. 18), that
characterization misses the critical point that such opinions
must not only be rendered by qualified medical witnesses but are
also required to be solidly grounded in admissible evidence (on
that score, see, e.g., such opinions as United States v. Mamah,
332 F.3d 475, 477-78 (7th Cir. 2003)).

23

record in a prior proceeding" (Schmidt v. Barnhart, 395 F.3d 737, 741-42 (7th Cir. 2005), quoting Section 405(g)). Here Hunt seeks such a remand so that Commissioner can review an autopsy and a coroner's report regarding Hunt's death. But Hunt fails to satisfy at least two of the three requirements for sentence six relief, so that his request is denied.

First, Hunt argues that the evidence is "new" because it "was found and obtained by counsel, and was received under cover letter dated March 16, 2006," obviously well after Commissioner's determination became final (H. Mem. 8). But the relevant test is rather whether the evidence "was not in existence or available to the claimant at the time of the administrative proceeding" (Schmidt, 395 F.3d at 742 (citation and internal quotation marks omitted)). In this instance the evidence did exist at the time of the administrative proceeding--the autopsy itself was performed December 11, 2002, the "Final Autopsy Report" and lab results were dated December 18, 2002 and the Coroner's Investigative Report was dated April 12, 2003, all well before the August 6, 2003 Hearing. Nor does Hunt contend that the evidence was nevertheless "unavailable" in some way.

Nor has Hunt demonstrated the necessary "good cause" for the failure to provide the evidence earlier. To be sure, a showing that ex-wife Patricia had no reason to be aware that an autopsy was even performed--for example because, as Hunt argues, she was

24

not informed of his death until several months after the fact--
could potentially provide such a justification. But here there
was good reason for Patricia to have been aware of the autopsy
despite that delayed notification: Included in the
administrative record was Hunt's death certificate, which
specifically notes that an autopsy had been performed (R. 85).
Hunt offers no explanation as to why, despite that notice of the
autopsy's existence, neither it nor other related evidence such
as the coroner's report was provided before now. Because Hunt
has established neither that the evidence in question is "new"
nor that there was good cause for the failure to provide it
earlier (either of which failures would suffice to defeat his
request), his request for a remand under sentence six of Section
405(g) is denied.

## Conclusion

More often than not the undemanding level of judicial review
of ALJ social security disability decisions should result in
upholding Commissioner's denial of such benefits. Here, however,
this opinion has set out a substantial number of deficiencies in
the ALJ's findings and conclusions that plainly call for a
different result. Nonetheless the limitations imposed by law on
this Court's power of review preclude any outright reversal.
After all, the flaws identified here occurred at step 4, so that

no step 5 analysis has taken place.[17]

Accordingly the case is remanded to Commissioner under
sentence four of Section 405(g) for a determination consistent
with what has been said in this opinion. And lastly, as our
Court of Appeals has found itself called upon to do under
comparable circumstances (see, e.g., Sarchet v. Chater, 78 F.3d
305, 309 (7th Cir. 1996) for an articulation of its concerns in
that respect), this Court recommends assignment to a different
ALJ on remand.

_____
Milton I. Shadur
Senior United States District Judge

Date:  July 25, 2006

---

[17]  Moreover, if Hunt is ultimately found to have been
disabled, the appropriate onset date will have to be determined.